**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

RASHEEN MCGRIER,

                                   Plaintiff,                    1:20-cv-01044 (BKS/DJS)

v.

CAPITAL CARDIOLOGY,

                                   Defendant.

**Appearances:**

*Plaintiff pro se:*
Rasheen McGrier
P.O. Box 66442
Albany, NY 12206

*For Defendant:*
Vincent E. Polsinelli
Alexander Scott Dahle
Jackson Lewis P.C.
677 Broadway 9th Floor
Albany, NY 12207

**Hon. Brenda K. Sannes, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.    INTRODUCTION

       Plaintiff pro se Rasheen McGrier brings this action against his former employer,

Defendant Capital Cardiology Associates, P.C., alleging claims under Title VII of the Civil

Rights Act of 1964 ("Title VII"), *as amended*, 42 U.S.C. § 2000e *et seq.*, for discrimination and

retaliation on account of his race and gender.[1] (Dkt. No. 35). Defendant moves to dismiss the

---

[1] In his opposition brief, Plaintiff responds with two new claims for "hostile work environment based on national origin," and retaliation for engaging in protected activity when he complained about discrimination based on national origin. (Dkt. No. 40, at 6–7). Plaintiff's Second Amended Complaint and Charge of Discrimination refer only to the protected categories of gender and race. Plaintiff makes no mention of his national origin, and does not allege any

Second Amended Complaint for failure to state a claim. (Dkt. No. 39). Plaintiff opposes. (Dkt.

No. 40). For the reasons set forth below, Defendant's motion to dismiss is denied.

## II.    FACTS[2]

### A.    Plaintiff's Position at Capital Cardiology

Plaintiff, an African American man, (*see* Dkt. No. 35-1, at 4; Dkt. No. 35-2, at 7), began

working at Capital Cardiology on April 10, 2017, as a Registration Associate, a position Plaintiff

describes as "a check in/check out for patients." (Dkt. No. 35-1, at 3; Dkt. No. 40, at 1). On or

about April 30, 2018, Plaintiff "was offered a promotion" to Remote Clinic Assistant. (Dkt. No.

35-1, at 3; Dkt. No. 40, at 2). Plaintiff took the position even though there was "no raise in pay."

(Dkt. No. 35-1, at 3). Maryellen King, Remote Monitoring and NP/PA Services Manager—who

is Caucasian—supervised Plaintiff in the position, which Plaintiff found to be very demanding

"and required a lot of billing and paperwork." (Dkt. No. 40, at 2). In January 2019, Defendant

hired Anita Nassim "for the same position" to help Plaintiff with his workload. (Dkt. No. 35-1, at

3).

---

instances of discrimination or retaliation based on his national origin in either the Second Amended Complaint or the Charge of Discrimination. Therefore, even considering Plaintiff's pro se status, because these are entirely new claims that do not arise out of the facts alleged in the Second Amended Complaint, the Court will not consider them. *See Vlad-Berindan v. MTA N.Y.C. Transit*, No. 14-cv-0675, 2014 WL 6982929, at *6–7, 2014 U.S. Dist. LEXIS 171289, at *11 (S.D.N.Y. Oct. 7, 2014) (finding in a pro se case that "[w]here a plaintiff's motion papers assert entirely new claims that do not arise out of the facts alleged in the complaint, the court need not consider them").

[2] The facts are drawn from (1) the Second Amended Complaint and its exhibits, (Dkt. Nos. 35-1, 35-2, 36), and, in view of Plaintiff's pro se status, (2) Plaintiff's response to Defendant's motion and its exhibits, to the extent the submissions are "consistent with the allegations in the complaint," (Dkt. No. 40, at 11–28), as well as (3) medical records Plaintiff submitted in opposition to a prior motion to dismiss, which are incorporated by reference in the Second Amended Complaint, (Dkt. No. 17; Dkt. No. 35, at 4). *See Crum v. Dodrill*, 562 F. Supp. 2d 366, 373–74 & n.13 (N.D.N.Y. 2008) ("[T]he mandate to read the papers of pro se litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint."). The Court assumes the truth of, and draws reasonable inferences from, the well-pleaded factual allegations. *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011).

### B.      Holter Monitor Tech and Nursing Support Openings

On or about March 1, 2018, a Holter Monitor Tech position opened, and Plaintiff asked

Human Resources Director Kelly Kschinka, who is Caucasian, about the position. (*See* Dkt. No.

35-1, at 3). Kschinka told Plaintiff that there would be interviews but that he should not apply if

he did not have the "experience or training for this position." (*Id.*; *see* Dkt. No. 35, at 2 ("EKG

experience is required for the Holter Monitor Tech position.")). Capital Cardiology hired a

Caucasian woman for the position, even though she had "no nursing degree," and "paid for" her

to receive "extra training." (Dkt. No. 35-1, at 3).

On April 5, 2019, Defendant hired a Caucasian male college student named Austin for a

Holter Monitor Tech position that Plaintiff had "wanted and showed interest [in] for about two

years." (Dkt. No. 35, at 2–3; *see* Dkt. No. 35-2, at 10). Austin had no EKG experience, and

Defendant provided him with training and paid for him to get an EKG Certificate. (Dkt. No. 35,

at 3). Austin "was allowed to work part-time and work at [Capitol Cardiology] as well with no

issues from HR." (*Id.*).

Plaintiff alleges that "on or about May 3, 2019," he "applied for another position" that he

"was qualified for." (Dkt. No. 35-1, at 4). In an email dated May 3, 2019, Kschinka notified

Plaintiff that "another candidate" had been "selected" to fill the "Nursing Support position in

Troy," New York and thanked Plaintiff for his "interest in the opportunity." (Dkt. No. 36, at 2).

Plaintiff alleges that he was not selected for this position "because of H[R]." (Dkt. No. 35, at 6–

7).[3]

On July 12, 2019, Plaintiff emailed his "new manager," Tracy Tilison, who is Caucasian,

that: "I would be interested in any upcoming positions within our department that opens up I do

---

[3] The record suggests that a Sherry Langlois was in charge of hiring for this position. (Dkt. No. 36, at 2).

want to move up and learn new skills and take on more responsibility within our Department." (Dkt. No. 35, at 2; Dkt. No. 35-1, at 4; Dkt. No. 35-2, at 5). Tilison replied that she would keep Plaintiff posted. (*Id.*).

On October 15, 2019, Plaintiff emailed Tilison, and asked whether the Holter Monitor Tech position was "MA Required."[4] (Dkt. No. 35, at 2; Dkt. No. 35-2, at 9). Tilison responded that "EKG experience is required." (Dkt. No. 35 at 2; Dkt. No. 35-2, at 8). Plaintiff alleges that Tilison told him that she "would not consider extra training for" him. (Dkt. No. 40, at 2). Plaintiff alleges: "Training was provided and paid for to all new Caucasian staff hired without EKG experience. No African Americans hired for that position. Causation [sic] employee hired without experience." (Dkt. No. 35, at 2).

### C.    Complaints to King, Kschinka, and Tilison and Nassim's "Sabotage" Attempts

On January 23, 2019, Plaintiff emailed King, writing: "[s]ince you sent that email out regarding the seating and desk arrangements," there had been "some tension between" two of his co-workers, Rebecca and Star, "regarding the arrangements of the office." (Dkt. No. 40, at 11). Plaintiff reported that "Rebecca took it out on [him]" by "raising her voice" at him over "turning [his] light on." (*Id.*). Plaintiff wrote that Rebecca's conduct made him "feel very uncomfortable" and he wanted to bring it to King's attention. (*Id.*).

Plaintiff alleges that on May 22, 2019, he emailed King to report that "[e]ach time I walk by [Nassim's] computer she's applying to different positions on the computer." (*Id.*at 12).[5] King

---

[4] Nothing in the record defines "MA."

[5] This appears to be a reference to Nassim: Plaintiff writes next in his Charge of Discrimination that he "voiced his concerns again" to Tilison on September 26, 2019, (Dkt. No. 35-2, at 4), and an attached email from that date complains that Nassim was making loud personal phone calls and not doing her work, (*id.* at 12).

responded that she would "take care of it," but "nothing . . . changed" and the co-worker was never "written up." (Dkt. No. 35-1, at 4).

Plaintiff alleges that from June 2019 until January 2020, Nassim took actions to "sabotage" him, including: (1) placing billing sheets face-up on his desk so he would get fired for violations of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"); (2) "calling him gay and gossiping to other co-workers about him"; (3) "not helping him with work tasks that required teamwork"; and (4) "going to the manager spreading lies to get [Plaintiff] in trouble." (Dkt. No. 40, at 2).

On September 26, 2019, Plaintiff emailed Tilison that Nassim was "on the phone laughing and joking very loud with personal calls" was "not performing her duties." (Dkt. No. 35-1, at 4; Dkt. No. 35-2, at 12). Tilison replied that she would "address these issues" at a meeting the following week. (Dkt. No. 35-2, at 12). However, these issues were "never addressed in that meeting." (Dkt. No. 35-1, at 4). Plaintiff alleges that the same day, September 26, 2019, he "went to his immediate manager twice or more about [a] hostile work environment" and about a "co[-]worker harassing and bullying" him, creating a "toxic work" environment, and "[u]ndermining or deliberately impeding" his work. (Dkt. No. 35, at 3).

On October 23, 2019, Tilison "started to add more work duties on Plaintiff only" and "micromanaged" him after his "coworker made Plaintiff look bad" by making "false lies to get plaintiff in trouble [for] making homophobic remarks." (*Id.*).[6]

In a November 20, 2019, email to Tilison, Plaintiff wrote that two members of the "clinical staff" were not responding to his email or text inquiries regarding a patient and that

---

[6] Plaintiff also alleges that he sent an email to Tilison on October 23, 2019, to tell her that that a scanning project was "becoming overwhelming" to which Tilison responded by thanking Plaintiff for "letting [her] know," asking him to focus on "bubble sheets" instead, and telling him to finish scanning if he had any down time. (Dkt. No. 35-2, at 13).

when Plaintiff "tried to [say] hello" to one of the staff members he "was completely ignored with a nasty look." (Dkt. No. 35, at 3–4; Dkt. No. 35-2, at 15–16). Plaintiff asked Tilison if he had done something wrong and wrote that he felt "[v]ery [u]ncomfortable" and that he was "[n]ice to everyone," and wanted "the same in [r]eturn." (Dkt. No. 35-2, at 15–16). Tilison responded that she would "take care of" it. (*Id.* at 15). Tilison gave Plaintiff an extra job handling MRI consults, "without a raise in pay or promotion." (Dkt. No. 35, at 4).

Plaintiff emailed Human Resources Director Kschinka about his "concerns" on December 3, 2019, but received a reply from *Tilison*, who stated that he was doing a "great job," and that "she was aware and taking care of the complaints against his co-worker." (Dkt. No. 35-1, at 4). Plaintiff also emailed Tilison on December 3, 2019, to ask if he could meet with her. (Dkt. No. 35, at 4; Dkt. No. 35-2, at 17). Plaintiff and Tilison "addressed the same issues on December 4, 2019 [sic] nothing resolved." (Dkt. No. 35, at 4).

Plaintiff emailed Tilison on December 9, 2019, asking for an update on his desk/seating arrangement, as his area was "intolerable," and very noisy and distracting. (Dkt. No. 35, at 4; Dkt. No. 35-2, at 18). Tilison told him that she would follow up. (Dkt. No. 35-2, at 18). Plaintiff's office was "changed to a closet room with no ventilation[] and bar[el]y room to move." (Dkt. No. 35, at 4). Plaintiff began to develop several health issues due to stress. (*Id.*).[7]

On December 17, 2019, Plaintiff emailed Kschinka "after no resolution with managers about ongoing harassment and verbal abuse," requesting to meet to discuss a March 2019

---

[7] Plaintiff alleges that he suffers from anxiety and depression and that he was "seen frequently" at Capital Cardiology and "St Peters Emergency room for chest pains," which he developed due to stress while working at Capital Cardiology. (Dkt. No. 35, at 4; Dkt. No. 40 at 8; *see also* Dkt. No. 17, at 4 (January 16, 2019 diagnostic imaging report from St Peter's Health Partners indicating that Plaintiff had shortness of breath, with "mid streaky opacities" in the "retrocardiac region" of his lungs, and an enlarged cardiac silhouette), 5 (July 24, 2019 visit to St Peter's Health Partners Emergency Department, where Plaintiff complained of 10/10 chest pain), 1 (January 7, 2020 visit to St Peter's Emergency Department, where Plaintiff reported chest and abdominal pain); Dkt. No. 36, at 3–6 (January 7, 2020 visit to St Peter's Emergency Department)). Plaintiff also saw a counselor between September 20, 2018 and November 1, 2018, discussing stress related to family issues. (Dkt. No. 40, at 23).

Corrective Action Notice and to discuss "other questions related to that topic." (Dkt. No. 35, at 4; Dkt. No. 35-2, at 19–21). Kschinka seemed "hesitant" about the meeting but told Plaintiff that his concerns "will be taken care of." (Dkt. No. 35, at 4).

On January 23, 2020, Plaintiff again complained to King about Nassim's "behavior." (*Id.* at 6; Dkt. No. 40, at 4).

### D.   Corrective Action Notice

On March 22, 2019, King issued Plaintiff an "Employee Corrective Action Notice"; the box next to "informal warning" is checked at the top of the form. (Dkt. No. 35, at 1; Dkt. No. 35-2, at 1–2). King identified "productivity" and "teamwork and work environment" as "current problems." (Dkt. No. 35-2, at 1). Regarding productivity, King noted that Plaintiff was "not maximizing time [and] getting work done," that she had spoken with Plaintiff in February 2019 about data "not being added to spreadsheets," and that, in the past two weeks, Plaintiff had completed 24 tasks, whereas Nassim[8] had completed 146. (*Id.*). Furthermore, King noted that Plaintiff had been "contributing to conflict in [the] department" by telling a co-worker not only that "others were ridiculing her" but also that a manager, Tracy Tilison, was instigating the ridicule. (*Id.* at 1–2, 8). King explained that Plaintiff's "[p]roductivity will be monitored closely moving forward," noted that Plaintiff would "assume daily responsibility for returned . . . monitors," and instructed Plaintiff to bring "concerns about the team environment" or "co-worker behavior" "to manager attention." (*Id.* at 1–2).

Plaintiff alleges that the Corrective Action Notice was improper because he had not received a prior verbal warning, and that the allegations about his lack of productivity were false

---

[8] King's notes appear to refer to "Nasin" and "Nair," (Dkt. No. 35-2, at 1), but in his response to the informal warning, Plaintiff wrote that it was biased and unfair to compare his work to "Anita," (*id.* at 6), so it appears that King's notes reference Anita *Nassim*.

because he was not trained for the tasks King accused him of failing to complete, and "weren[']t part of [his] normal job duties," which were "limited to billing" and which he "always completed." (Dkt. No. 35, at 1; Dkt. No. 35-1, at 4).

On March 25, 2019, Plaintiff emailed HR Director Kschinka that he "disagreed" with the Corrective Action Notice. (Dkt. No. 35, at 2; Dkt. No. 35-2, at 6). Plaintiff wrote that: his billing numbers were accurate; he felt it was "[v]ery bias[ed] and unfair" to compare his work to Nassim's; he had received a positive 90-day review; and that he had a "great" work ethic and attendance. (Dkt. No. 35-2, at 6–7). Plaintiff, however, acknowledged that he "was not [f]ocused" "regarding disconnect monitors," but that he had "been very distracted ever since the seating arrangement" changed and he was placed next to "Co Worker Star," who was "on her phone laughing and stirring up drama." (*Id.* at 6). Plaintiff wrote that he had emailed King about "seating [that] made [him] feel uncomfortable working in a hostile environment." (*Id.* at 7). Plaintiff also disputed the allegation that he was "contributing to conflict," stating that he treated everyone with respect and explaining that the co-worker discussed in the Corrective Action Notice had approached *him* to ask why the manager was talking about her.[9] (Dkt. No. 35, at 2; Dkt. No. 35-2, at 3–4, 6–7). He further wrote that he suspected that Tilison made King "make up lies" in order to get him "written up," and that: "I don't [know] if it has anything [to] do with my race or not but I [w]onder." (Dkt. No. 35-2, at 7; Dkt. No. 35-1, at 4). He noted that he is a "young Black Well Educated Man with no Bad history throughout [his] Work history." (Dkt. No. 35-2, at 7). Plaintiff requested that the Corrective Action Notice be removed from his file, an "Appeal," and a meeting with Kschinka. (Dkt. No. 35, at 2; Dkt. No. 35-2, at 6).

---

[9] Plaintiff attached to the Second Amended Complaint a copy of text messages from "Jenn Co Worker" stating that she "heard from multiple people that [Tilison] was making fun of [her]." (Dkt. No. 35-2, at 4).

Plaintiff alleges that another African American employee, Startasia Washington, was written up for tardiness while pregnant and having health issues. (Dkt. No. 40, at 3).[10]

### E.     Positive Reference and Performance Review

On March 26, 2019, Plaintiff "[r]eceived a [r]eference for a [c]ollege intern[ship]" from Sherry Langlois, a manager at Capital Cardiology. (Dkt. No. 35, at 6; Dkt. No. 36, at 1). In the letter, Langlois wrote that she had worked with Plaintiff from April 2017 through May 2018 when he was a "Patient Check-Out Associate." (Dkt. No. 36, at 1). She wrote that Plaintiff was pleasant and helpful with patients, and that he was a "personable young man" who "conducts himself in an affable, compassionate and gentle manner," and "has pizzazz." (*Id.*). Langlois noted that although she no longer saw him on a daily basis, Plaintiff was still "helpful, considerate and friendly," and that when she calls him with questions, if he does not have an answer, "he will research it until he comes up with it." (*Id.*).[11]

In April 2019, Plaintiff received a positive annual performance review. (Dkt. No. 35, at 23).

### F.     Plaintiff's Resignation

On January 24, 2020, Plaintiff was called into King's office, where Kschinka and King told him that "this was an investigation" and "interrogated" him. (Dkt. No. 35, at 4; Dkt. No. 40, at 4). Kschinka asked Plaintiff "about applying for a part time job on weekends." (Dkt. No. 40, at 2–3). Although "there were several coworkers who were Caucasian employees who had part time jobs," Kschinka told Plaintiff she could "fire [him] right now" and "demanded that [Plaintiff] delete his Indeed profile." (*Id.* at 3). Kschinka and King accused Plaintiff of harassing

---

[10] Plaintiff does not specify when this took place.

[11] Plaintiff alleges that Langlois "got in trouble" for writing this reference, (Dkt. No. 35, at 7), but provides no specifics.

and bullying Nassim. (Dkt. No. 35, at 4–5; Dkt. No. 40, at 4). Kschinka "called plaintiff a liar," and threatened to terminate him "for lying," told him that he would "have to move to a different location," and raised her voice. (Dkt. No. 35, at 5; Dkt. No. 40, at 4). Kschinka also told Plaintiff that the investigation would be continued and that there "will be consequences." (Dkt. No. 40, at 4).

Plaintiff resigned effective that day. (Dkt. No. 35, at 5; Dkt. No. 35-2, at 22). In his resignation letter, Plaintiff wrote that he was quitting "due to discrimination" and being accused of "something I didn't do." (Dkt. No. 35-2, at 22). He wrote that Kschinka told him she was investigating him "over something she heard over a [t]ext," and that he would "not tolerate it" because he "was a hard worker and being taken advantage of." (*Id.*). He further wrote that people envied him when Tilison assigned him the extra MRI job. (*Id.*). Kschinka responded via email and told Plaintiff that she had "proof" that he had "texted co-workers to complain and bad mouth others in the department," and that Plaintiff lied to her. (*Id.* at 23). In a letter dated that same day, Kschinka wrote that Capital Cardiology accepted Plaintiff's resignation effective January 24, 2020, Plaintiff's health and dental insurance would be "terminated effective 01/31/2020," and his last paycheck would issue on February 7, 2020, (Dkt. No. 40, at 20).

On January 25, 2020, Plaintiff replied to Kschinka's email, and asserted that although other people in his department had productivity issues, and bad-mouthed others—including, Nassim, who had slept on the job, made long personal phone calls, looked for other jobs on her computer, and failed to meet productivity goals—he was the only one "written up" or threatened with termination. (*Id.*). Plaintiff also asserted that Nassim's accusations against him were false and that she was trying to "sabotage [his] job" in retaliation for Tilison's assignment of the extra MRI job to Plaintiff "instead of her" and because she was told to "mind[] her business" when she

complained to Tilison about Plaintiff's productivity. (*Id.*). Plaintiff wrote that he came to work every day, went beyond expectations, stayed late, and took on extra jobs that were not part of his job description, but was denied promotions and raises. (*Id.*). Plaintiff stated that he would not "tolerate being taken [a]dvantage of and being [t]alked [d]own to because of [his r]ace." (*Id.*). Plaintiff questioned why he was threatened with termination for applying for a second job when at least three other employees had applied for, or had, second jobs, and asserted his treatment was due to "discrimination." (*Id.* at 26).

### G.    Post-Employment Issues

On February 2, 2020, Plaintiff emailed HR Coordinator Catherine Cardona, asking why he did not "see . . .  paid time off he had earned" on his timecard. (Dkt. No. 35, at 7; Dkt. No. 35-2, at 28). Cardona responded that Plaintiff had "quit without notice," and "[p]er our policy," Capital Cardiology did not "pay out vacation" without proper notice. (*Id.*).

In a letter to Plaintiff dated February 7, 2020, Kschinka wrote that "following [his] departure," Capital Cardiology discovered that Plaintiff had forwarded work emails to his home email address between August 21, 2019 and January 9, 2020 "which contained PHI (Protected Health Information)" on four patients. (Dkt. No. 35, at 5; Dkt. No. 35-2, at 27). Kschinka advised that Capital Cardiology was in the process of determining whether this was a HIPAA reportable violation, and asked him to respond by mail, "and explain why [he] forwarded these emails to [his] home email address." (*Id.*). Plaintiff later received a voicemail and phone call from Kschinka. (Dkt. No. 35, at 5). Plaintiff maintains that he "never violated HIPAA laws," (Dkt. No. 35-1, at 4), and the emails were "saved emails sent months back from dialogue between [Plaintiff] and coworkers" and management including Kschinka, among others. (Dkt. No. 40, at 4–5).

After leaving Capital Cardiology, Plaintiff suffered a "significant loss of income," and "had to seek employment at Macy's at [sic] lower pay rate." (*Id.* at 8). He had to move into a "Room and Board" and seek emergency assistance due to homelessness. (*Id.*). On October 19, 2020, Plaintiff received an email from Meghan Carroll, the Family Apartment Program Manager at Catholic Charities Housing Office, informing Plaintiff that he was number 43 on the list for housing. (Dkt. No. 40, at 25). Plaintiff asked, "how long is 43," to which Carroll responded that the list "changes daily," and that Catholic Charities "prioritize[s] any applicant who is homeless." (*Id.* at 24–25). Carroll noted that, when Plaintiff submitted his application, he was "homeless and residing at 331 1st Street." (*Id.* at 24).

### H.    Charge of Discrimination and Right-To-Sue Letter

On April 6, 2020, Plaintiff filed a Charge of Discrimination (the "Charge") with the Equal Employment Opportunity Commission ("EEOC") and checked the boxes for discrimination based on "Race," "Sex," and "Retaliation." (Dkt. No. 35-1, at 3).[12] On September 1, 2020, the EEOC issued a dismissal and a right-to-sue letter, stating that based on its investigation it was "unable to conclude that the information obtained establishes violation of the statutes." (*Id.* at 1).

## III.   STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6) for failure to state a claim, "a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.'"

---

[12] The Charge does not indicate when it was filed with the EEOC, only that Plaintiff digitally signed it on April 4, 2020. (Dkt. No. 35-1, at 3–4). Defendant references this as the filing date, (Dkt. No. 39-1, at 8), which Plaintiff does not dispute. Thus, the Court will consider April 4, 2020 as the filing date for the purposes of this motion. *See Auguste v. N.Y. Presbyterian Med. Ctr.*, 593 F. Supp. 2d 659, 661 (S.D.N.Y. Jan. 14, 2009) (using the date that a charge of discrimination was notarized as the filing date when the charge did not indicate a filing date); *Santiago v. Newburgh Enlarged City Sch. Dist.*, 485 F. Supp. 2d 327, 331 (S.D.N.Y. 2007) (assuming, for the purposes of a summary judgment motion, that the filing date of the plaintiff's EEOC charge was the date the charge was "executed by the plaintiff" and not the "stamped 'received'" date by EEOC).

*Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The claimant must provide factual allegations sufficient "to raise a right to relief above the speculative level." *Id.* (quoting *Twombly*, 550 U.S. at 555). The court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the claimant's favor. *See EEOC v. Port Auth.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. Because Plaintiff is proceeding pro se, his submissions "must be construed liberally and interpreted 'to raise the strongest arguments that they suggest.'" *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006).

## IV.   DISCUSSION

Defendant moves to dismiss the Second Amended Complaint on the grounds that: (1) it "is largely time-barred" because many of the claims occurred more than 300 days before Plaintiff filed the EEOC Charge; (2) Plaintiff fails to allege that his voluntary resignation from employment was a constructive discharge; (3) Plaintiff fails to allege discriminatory animus based on race or gender; and (4) Plaintiff fails to allege protected activity, adverse action, or causal connection and thus fails to state a claim for retaliation. (Dkt. No. 39-1, at 8–14). Plaintiff opposes Defendant's motion. (Dkt. No. 40).

A.      **Timeliness**

Defendant argues that any discrimination or retaliation claims based on events that took place prior to June 11, 2019 (300 days before Plaintiff filed his Charge with the EEOC on April 6, 2020), should be dismissed as time-barred. (Dkt. No. 39-1, at 8–9).[13]

"As a precondition to filing a Title VII claim in federal court, a plaintiff must first pursue available administrative remedies and file a timely complaint with the EEOC." *Hardaway v. Hartford Pub. Works Dep't*, 879 F.3d 486, 489 (2d Cir. 2018) (quoting *Deravin v. Kerik*, 335 F.3d 195, 200 (2d Cir. 2003)); *see also* 42 U.S.C. § 2000e–5(e) and (f). In New York, "individuals aggrieved by acts of discrimination [must] file a charge with the EEOC within . . . 300 days 'after the alleged unlawful employment practice occurred.'" *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 78–79 (2d Cir. 2015) (quoting 42 U.S.C. § 2000e–5(e)(1)). Failing to timely file a charge "acts as a bar to a plaintiff's ability to bring the action." *Semper v. New York Methodist Hosp.*, 786 F. Supp. 2d 566, 576 (E.D.N.Y. 2011) (citing *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982)). Though time-barred, discrete prior acts falling outside the limitations period may be used as "background evidence in support of a timely claim." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). The Title VII exhaustion requirements, and their filing deadlines, operate as an affirmative defense. *Hardaway*, 879 F.3d at 491. "[T]he burden of pleading and proving Title VII exhaustion" therefore "lies with defendants." *Id.*

"Statute of limitations defenses are affirmative defenses, which normally cannot be decided on a motion to dismiss." *In re S. African Apartheid Litig.*, 617 F. Supp. 2d 228, 287

---

[13] Defendant also argues in its reply brief that Plaintiff failed to exhaust his administrative remedies as to conduct that he did not include in his Charge of Discrimination. (Dkt. No. 41, at 6 n.2). Because this argument was raised for the first time in a reply brief, the Court will not consider it. *See Conn. Bar Ass'n v. United States*, 620 F.3d 81, 91 n.13 (2d Cir. 2010).

(S.D.N.Y. 2009). "However, an exception is made where the complaint *facially* shows noncompliance with the limitations period and the affirmative defense clearly appears on the face of the pleading." *Id.* (internal quotation marks omitted).

Even if the April 4, 2020 EEOC charge was untimely as to some of claims, because the pleadings suggests that at points prior to filing the charge, Plaintiff was suffering mental health and medical issues, (Dkt. No. 17, at 1, 4–5; Dkt. No. 36, at 3–6; Dkt. No. 40, at 23), and that he was "homeless" and "had to move in a Room and Board after forced resignation" on January 24, 2020, (Dkt. No. 40, at 8, 23–24),[14] equitable tolling may be appropriate. *Zerilli-Edelglass v. New York City Transit Auth.*, 333 F.3d 74, 80 (2d Cir. 2003) ("Equitable tolling is generally considered appropriate . . . where a plaintiff's medical condition or mental impairment prevented [him] from proceeding in a timely fashion."); *Lopez v. Nassau Cty. Sheriffs Dep't*, No. 17-cv-3722, 2018 WL 3321430, at *5, 2018 U.S. Dist. LEXIS 111943, at *13 (E.D.N.Y. July 5, 2018) ("Plaintiff contends that one of the reasons for his late receipt of the Claims Notice was his 'homelessness condition;' . . . [a]lthough not labeled as such, it appears that this pro se plaintiff seeks equitable tolling for the statute of limitations period."); *see also Zipes*, 455 U.S. at 393 ("[F]iling a timely charge of discrimination with the EEOC is . . . a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling."). As factual development is required, the Court cannot say that "the affirmative defense appears on the face of the pleading." *In re S. African Apartheid Litig.*, 617 F. Supp. 2d at 287.

---

[14] Although the emails Plaintiff submitted from Catholic Charities regarding housing are dated October 19, 2020—*after* he filed the Charge on April 6, 2020—the emails do not necessarily foreclose equitable tolling due to homelessness because they reflect only that Plaintiff was inquiring about housing availability and that he was homeless at the time he submitted his application for housing; they do not reflect when Plaintiff first submitted his application and say nothing about when he became homeless. (Dkt. No. 40, at 24–25).

B.      **Title VII Discrimination**

Defendant seeks dismissal of Plaintiff's race and gender discrimination claims on the

grounds that Plaintiff fails to allege that his "voluntary resignation" was constructive discharge,

and fails to allege racial or gender animus. (Dkt. No. 39-1, at 9–13).

Title VII claims are analyzed under the burden-shifting framework of *McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir.

2015). But the first step of the *McDonnell Douglas* analysis—establishment of a prima facie

case—is "an evidentiary standard, not a pleading requirement." *Swierkiewicz v. Sorema N.A.*,

534 U.S. 506, 510 (2002) ("[W]e hold that an employment discrimination plaintiff need not

plead a prima facie case of discrimination [to avoid dismissal]."). As this motion is one to

dismiss, the Court "focus[es] only on whether the allegations in the complaint give plausible

support to the reduced prima facie requirements that arise under *McDonnell Douglas* in the

initial phase of a litigation." *Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015). To

defeat a motion to dismiss, "a plaintiff must plausibly allege that (1) the employer took adverse

action against him, and (2) his race, color, religion, sex or national origin was a motivating factor

in the employment decision." *Vega*, 801 F.3d at 87.

The Second Circuit has held that:

> A plaintiff sustains an adverse employment action if he or she
> endures a materially adverse change in the terms and conditions of
> employment. To be materially adverse a change in working
> conditions must be more disruptive than a mere inconvenience or an
> alteration of job responsibilities. A materially adverse change might
> be indicated by a termination of employment, a demotion evidenced
> by a decrease in wage or salary, a less distinguished title, a material
> loss of benefits, significantly diminished material responsibilities,
> or other indices . . . unique to a particular situation.

*Shultz v. Congregation Shearith Israel of City of N.Y.*, 867 F.3d 298, 304 (2d Cir. 2017) (quoting

*Galabya v. N.Y. City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000)). Moreover, a plaintiff may

demonstrate that race or sex was a motivating factor in the adverse action "by alleging facts that directly show discrimination or facts that indirectly show discrimination by giving rise to a plausible inference of discrimination." *Vega*, 801 F.3d at 87. At the motion to dismiss stage, a complaint is sufficient "if it pleads specific facts that support a minimal plausible inference of such discrimination." *Doe v. Columbia Univ.*, 831 F.3d 46, 56 (2d Cir. 2016).

### 1.   Adverse Actions

Although Defendant seeks dismissal of Plaintiff's race and gender discrimination claims in their entirety, the only adverse action Defendant addresses on the merits is Plaintiff's claim of constructive discharge. Defendant acknowledged, however, in connection with its argument regarding the timeliness of Plaintiff's claims, that Plaintiff alleges additional adverse actions, including the issuance of a corrective action notice and failure to promote. (Dkt. No. 39-1, at 9). In addition, viewed liberally, as it must be in light of Plaintiff's pro se status, the Second Amended Complaint may be read to claim the following adverse actions: issuance of a corrective action notice, failure to promote, micromanagement, placement in an "intolerable" workspace, increased workload, supervisory inaction to complaints, and threats of investigation and termination.

### a.   Corrective Action Notice

On March 22, 2019, King issued Plaintiff a corrective action notice identifying Plaintiff's productivity as a "problem" and asserting that Plaintiff was "contributing to conflict" in the workplace. (Dkt. No. 35-2, at 1). In general, however, "[e]ven a negative or critical evaluation 'will not constitute an adverse employment action unless the evaluation is accompanied by other adverse consequences.'" *Ziyan Shi v. New York Dep't of State, Div. of Licensing Servs.*, 393 F. Supp. 3d 329, 338 (S.D.N.Y. 2019) (quoting *Ragin v. E. Ramapo Cent. Sch. Dist.*, No. 05-cv-6496, 2010 WL 1326779, at *17, 2010 U.S. Dist. LEXIS 32576, at *51 (S.D.N.Y. Mar. 31,

2010)). As Plaintiff does not allege any additional adverse consequences as a result of the

corrective action notice, he fails to allege it constitutes an adverse action for purposes of a

discrimination claim. Accordingly, Defendant's motion to dismiss is granted as to Plaintiff's

corrective action notice discrimination claim.

**b.      Failure to Promote**

Plaintiff identifies three positions to which he was denied promotion: two Holter Monitor

Tech positions, the first in March 2018 and the second in April 2019, and the nursing support

position in May 2019. "To plead a plausible failure-to-promote claim, a plaintiff must allege: '(1)

that he is a member of a protected class; (2) that he applied for a promotion to a position for

which he was qualified; [and] (3) that he was rejected for the position; and (4) after this rejection,

the position was filled by someone . . . who was similarly or less well qualified than the

plaintiff.'" *Brophy v. Chao*, No. 17-cv-9527, 2019 WL 498251, at *4, 2019 U.S. Dist. LEXIS

20886, at *11 (S.D.N.Y. Feb. 7, 2019) (quoting *Wheeler v. Bank of N.Y. Mellon*, No. 16-cv-1176,

2018 WL 3730862, at *5, 2018 U.S. Dist. LEXIS 131456, at *14 (N.D.N.Y. Aug. 6, 2018)).

**i.      Holter Monitor Tech Position**

Here, Plaintiff has not alleged that he *applied for* the Holter Monitor Tech positions, but

rather, that he expressed interest in a promotion, and inquired about the requirements for the

position. *See Taylor v. City of New York*, 207 F. Supp. 3d 293, 306 (S.D.N.Y. 2016) (dismissing

failure-to-promote claim on a motion to dismiss where the plaintiff had not alleged that she

actually applied to the position, merely that she made numerous inquiries, because expressing a

"general interest in promotion . . . is not enough to excuse her from the specific-application

requirement") (first citing *Tulino v. City of New York*, No. 15-cv-7106, 2016 WL 2967847, at *6,

2016 U.S. Dist. LEXIS 66012, at *19 (S.D.N.Y. May 19, 2016), and then citing *Petrosino v. Bell*

*Atl.*, 385 F.3d 210, 227 (2d Cir. 2004) ("[T]he second element of a *prima facie* showing cannot

be established merely with evidence that a plaintiff generally requested promotion

consideration.")).

"However, 'a plaintiff's failure to apply for a position is not a bar to relief when an

employer's discriminatory practices deter application or make application a futile endeavor.'"

*Hunt v. Consolidated Edison Co. of N.Y., Inc.*, No. 18-cv-7262, 2021 WL 3492716, at *6, 2021

U.S. Dist. LEXIS 149194, at *16 (E.D.N.Y. Aug. 9, 2021) (quoting *Malarkey v. Texaco, Inc.*,

983 F.2d 1204, 1213 (2d Cir. 1993)); *see also Thelwell v. City of New York*, 733 F. App'x 561,

563 (2d Cir. 2018) (summary order) (same). "Where an application would be futile, a plaintiff

can instead 'allege the specific positions to which [he] would have applied had the alleged

discriminatory practices not existed.'" *Hunt*, 2021 WL 3492716, at *6, 2021 U.S. Dist. LEXIS

149194, at *16 (citing *Brown v. Coach Stores*, 163 F.3d 706, 711 (2d Cir. 1998)).

Here, Plaintiff alleges that he expressed interest in Holter Monitor Tech position in

March 2018 and July and October 2019. (Dkt. No. 35, at 2; Dkt. No. 35-1, at 3–4; Dkt. No. 35-2,

at 5). Further, his allegations allow a plausible inference that he would have applied for it had he

not been told that it required EKG experience, that he should not apply unless he had

"experience and training," and that "extra training" would not be considered for Plaintiff. (Dkt.

No. 35-1, at 3; Dkt. No. 40, at 2). When Plaintiff inquired in March 2018 about an open Holter

Monitor Tech position, Kschinka told Plaintiff he should not apply if he did not have the

"experience or training for this position." (Dkt. No. 35-1, at 3; *see* Dkt. No. 35, at 2 ("EKG

experience is required for the Holter Monitor Tech position."). Plaintiff further alleges that

Defendant hired Caucasian female and male for the positions, even though they did not have the

requisite training and that Defendant paid for their training. (Dkt. No. 35, at 2–3; Dkt. No. 35-2,

at 10). These allegations are sufficient to allow a plausible inference that applying for the

position would have been futile. *Hunt*, 2021 WL 3492716, at *7, 2021 U.S. Dist. LEXIS 149194, at *16 (finding that the plaintiff "plausibly alleged at the pleading stage that applying to be promoted would have been a 'futile gesture' where he alleged that "applying for a promotion would have been futile because minority employees are typically not selected . . . and because he is continuously placed on a probationary status that bars him from applying for promotions outside the department" (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 366 (1977)); *see also Hnot v. Willis Grp. Holdings Ltd.*, No. 01-cv-6558, 2005 WL 831665, at *8, 2005 U.S. Dist. LEXIS 6064, at *24–25 (S.D.N.Y. Apr. 8, 2005) (finding that the plaintiff had established a prima facie case that she was unfairly denied promotions due to gender discrimination when she alleged that she expressed her interest in a CEO position to several senior managers, and noting that "expressing an interest in promotion to a particular class of positions . . . may satisfy the requirement that the employee apply for the position" (quoting *Williams v. R.H. Donnelley, Corp.*, 369 F.3d 123, 129 (2d Cir. 2004))); Accordingly, Plaintiff adequately alleges failure to promote in connection with the Holter Monitor Tech position as an adverse action.

### ii.  Nursing Support Position

Plaintiff alleges that on or about May 3, 2019, he applied for a "Nursing Support position," and was notified by Kschinka that Langlois had "selected another candidate to fill her nursing support position in Troy," New York. (Dkt. No. 35-1, at 4, Dkt. No. 36, at 2). Here, other than a conclusory assertion that he "was qualified for" the position, (Dkt. No. 35-1, at 4), Plaintiff provides no allegations that, as a remote clinic assistant whose responsibilities included "billing and paperwork," (Dkt. No. 40, at 2), he was qualified for the Nursing Support position. Nor are there any factual allegations regarding the individual who was hired, such as the individual's experience or training, and which might enable an inference regarding Plaintiff's

own qualifications. *See, e.g.*, *Wheeler v. Bank of New York Mellon*, No. 16-cv-1176, 2018 WL 3730862, at *6, 2018 U.S. Dist. LEXIS 131456, at *16 (N.D.N.Y. Aug. 6, 2018) (denying the defendant's motion to dismiss failure to promote claim where the plaintiff "plausibly alleged that" the individual who received the promotion "was less experienced than [the plaintiff] and, thus, less qualified for the Account Administrator II position"). Thus, Plaintiff fails to allege a plausible failure to promote claim in connection with the Nursing Support position.[15]

### c.      Micromanagement

Plaintiff alleges that he was being "micromanaged" by Tilison a co-worker made him "look bad." (Dkt. No. 35, at 3). Micromanagement by a supervisor, by itself, is not an adverse employment action. *See Costello v. N.Y. State Nurses Ass'n*, 783 F. Supp. 2d 656, 677–78 (S.D.N.Y. 2011) (finding allegations that the plaintiff's supervisor was "micromanaging" her schedule did not qualify as an adverse employment action, as she "suffered no demotion, material loss of benefits, or significantly diminished material responsibilities") (citing *Kessler v. Westchester Cty. Dep't of Soc. Servs.*, 461 F.3d 199, 207 (2d Cir. 2006)); *see also Dawson v. City of New York*, No. 09-cv-5348, 2013 WL 4504620, at *10, 2013 U.S. Dist. LEXIS 117744, at *26–27 (S.D.N.Y. Aug. 19, 2013) ("Excessive scrutiny, monitoring, and criticisms of . . . job performance," were not adverse employment actions absent evidence of materially adverse impact). Not only is Plaintiff's claim of micromanagement conclusory—Plaintiff provides no factual details regarding Tilison's actions—but Plaintiff does not allege that this micromanagement corresponded with a demotion, loss of benefits, or diminished responsibilities,

---

[15] Because an allegation that Plaintiff was qualified for the position is also required to state a retaliatory failure to promote claim, *cf., e.g.*, *Offor v. Mercy Med. Ctr.*, 676 F. App'x 51, 54 (2d Cir. 2017) (finding the plaintiff "has plausibly alleged that she [engaged in protected activity], that she was qualified for her position, and that she suffered an adverse employment action when she was put on . . . probation.") (emphasis added), to the extent Plaintiff asserts such a claim, it is also dismissed.

he has not plausibly alleged that it was an adverse employment action, and any micromanagement discrimination claims are dismissed.

### d.   Workspace

Plaintiff alleges that his workspace was "intolerable," and that after he complained to his supervisor that his area was "very noisy and distracting," (Dkt. No. 35-2, at 18), he was moved to a "closet room with no ventilation[] and bar[ely] room to move," (Dkt. No. 35, at 4). Relocation to a smaller office, even one with poor ventilation, is a "mere inconvenience," not an adverse employment action for purposes of a discrimination claim. *See Hepburn v. City of Torrington*, No. 02-cv-1252, 2004 WL 1771590, at *5, 2004 U.S. Dist. LEXIS 15163, at *16 (D. Conn. Aug. 4, 2004) ("[T]he move to a smaller office is 'a mere inconvenience,'"); *Trachtenberg v. Dep't of Educ. of City of N.Y.*, 937 F. Supp. 2d 460, 468 (S.D.N.Y. 2013) ("[T]he relocation of Trachtenberg's office to a windowless, poorly ventilated room does not constitute an adverse employment action." (citing *Crawford-Bey v. N.Y. & Presbyterian Hosp.*, No. 08-cv-545, 2011 WL 4530193, at *5–6, 2011 U.S. Dist. LEXIS 113073, at *19 (S.D.N.Y. Sept. 30, 2011))); *St. Ledger v. Area Co-op. Educ. Servs.*, 228 F. Supp. 2d 66, 74 (D. Conn. 2002) (finding no adverse employment actions when as a result of a transfer, the plaintiff was given a dirty and old desk, a non-functioning computer, no private office, no filing cabinet, and no computer). Therefore, Plaintiff has not plausibly alleged that his relocation to a smaller office was an adverse employment action, and any discrimination claims stemming from this action are, accordingly, dismissed.

### e.   Workload

Plaintiff alleges that Tilison gave him alone additional work duties, including handling MRI consults, without extra pay or a promotion. (Dkt. No. 35, at 3–4). "[A]ssignments that are part of an employee's normal responsibilities are not 'adverse employment actions' where . . .

the rate of pay and benefits remains the same." *Rodriguez v. Coca Cola Refreshments USA, Inc.*,

No. 12-cv-234, 2013 WL 5230037, at *3, 2013 U.S. Dist. LEXIS 131860, at *11 (E.D.N.Y. Sept.

16, 2013) (collecting cases). However, "a change in duties or job reassignment may be an

adverse employment action, 'if it results in a change in responsibilities so significant as to

constitute a setback to the plaintiff's career.'" *Edwards v. Huntington Union Free Sch. Dist.*, 957

F. Supp. 2d 203, 211 (E.D.N.Y. 2013) (quoting *Galabya*, 202 F.3d at 641). The assignment of a

disproportionately heavy workload may also, in some circumstances, constitute adverse

employment action. *See Cherry v. N.Y.C. Housing Auth.*, No. 15-cv-6949, 2021 WL 4481004, at

*12, 2021 U.S. Dist. LEXIS 191353, at *34–35 (E.D.N.Y. Sept. 30, 2021) (first citing

*Rodriguez-Coss v. Barr*, 776 F. App'x 717, 718 (2d Cir. 2019) (summary order) ("[T]he

assignment of a disproportionately heavy workload can constitute an adverse employment

action."); and then citing *Lopez v. Flight Servs. & Sys., Inc.*, 881 F. Supp. 2d 431, 441

(W.D.N.Y. 2012) ("[A] [d]isproportionately heavy workload could perhaps be an adverse action,

if the additional work significantly changed the employee's responsibilities so as to diminish that

worker's role or status . . ."))).

Here, Plaintiff alleges that on October 23, 2019, Tilison "started to add more work duties

on Plaintiff only," and on November 20, 2019, Tilison "added an extra job to plaintiff's job only

which was handling all MRI consults." (Dkt. No. 35, at 3–4). Plaintiff does not allege the nature

of the "work duties" he was given on October 23, 2019, and has not alleged that they constituted

a "significant" change in responsibilities. And, as to the MRI position, Plaintiff indicates in his

submissions that this was a desirable assignment. (*See* Dkt. No. 35-2, at 22 (writing in his

resignation letter that people "envied" him when was assigned MRI consults); *id.* at 25 (writing

in an email that Nassim had a[n] issue with MRI Job being handed off to me")). Therefore,

Plaintiff has not plausibly alleged that either change in responsibilities constituted a setback to his career. *See Edwards*, 957 F. Supp. 2d at 211.

Other allegations concerning Plaintiff's workload can be distilled from Plaintiff's submissions, including an October 23, 2019 email in which Plaintiff notified Tilison that he was becoming "overwhelm[ed]" with an assignment and made "a couple errors," (Dkt. No. 35-2, at 13), and Plaintiff's assertion to Kschinka following his resignation that he "[s]tayed [l]ate hours to [a]nd did [e]xtra jobs not part of my job description," (*id.* at 25). However, a single instance of becoming overwhelmed and conclusory references to staying late and performing extra work fail to allow a plausible inference that Plaintiff's workload was disproportionately heavy or constituted a setback to his career. *See Durant v. Yale Univ.*, No. 18-cv-431, 2020 WL 818904, at *5, 2020 U.S. Dist. LEXIS 27963, at *14–17 (D. Conn. Feb. 19, 2020) (finding that "vague opinions about less desirable work assignments" and one example of receiving a heavier work assignment than his co-workers did not raise an issue of material facts as to whether the plaintiff's workload was disproportionate to his Caucasian co-workers to as to create an adverse employment action).

### f.    Supervisory Inaction

Plaintiff alleges that he complained to Tilison, Kschinka, and King several times about "harassment and bullying" by his co-workers, or about his co-workers misbehaving, and that his supervisors failed to take care of these issues. (*See* Dkt. No. 35, at 3–4; Dkt. No. 35-2, at 12, 15–16). However, the case law is clear that supervisory inaction is not, by itself, an adverse employment action. *See Roache v. Long Island R.R.*, 487 F. Supp. 3d 154, 171 (E.D.N.Y. 2020) (holding that failure to investigate complaints does not constitute adverse employment action) (collecting cases); *Sesay-Harrell v. N.Y.C. Dep't of Homeless Servs.,* No. 12-cv-925, 2013 WL 6244158, at *15, 2013 U.S. Dist. LEXIS 170160, at *45 (S.D.N.Y. Dec. 2, 2013) (disciplinary

measures and supervisory inaction not adverse employment actions); *Hayes v. Kerik*, 414 F. Supp. 2d 193, 203 (E.D.N.Y. 2006) (holding that failing to properly investigate a plaintiff's discrimination complaint does not constitute an adverse employment action). Moreover, Plaintiff does not allege that any of these complaints about his co-workers involved "harassment or bullying" due to his race, or sex but rather, based on personal disputes. Thus, Plaintiff has not plausibly alleged that the inaction of his supervisors constituted an adverse employment action.

### g. Investigation and Termination Threats

Plaintiff alleges that he resigned on January 24, 2020, after Kschinka and King accused him of lying and of harassing and bullying Nassim and told him that he was being investigated and would have to "move to a different location" and "threatened" termination. (Dkt. No. 35, at 4–5; Dkt. No. 35-2, at 22; Dkt. No. 40, at 4).

As to the "investigation" and the threats of "consequences" and a move to a different location, threats of disciplinary action and excessive scrutiny do not constitute an adverse employment action, unless coupled with other "negative results." *See Uddin v. City of New York,* 427 F. Supp. 2d 414, 429 (S.D.N.Y. 2006) ("[C]ourts in this circuit have found that reprimands, threats of disciplinary action and excessive scrutiny do not constitute adverse employment actions in the absence of other negative results such as a decrease in pay or being placed on probation." (quoting *Honey v. County of Rockland,* 200 F. Supp. 2d 311, 320 (S.D.N.Y. 2002)); *see also Scafidi v. Baldwin Union Free Sch. Dist.,* 295 F. Supp. 2d 235, 239 (E.D.N.Y. 2003) ("[I]t is well-settled that '[t]o qualify as an adverse employment action, excessive scrutiny must be accompanied by unfavorable consequences.'"); *Bennett v. Watson Wyatt & Co.*, 136 F. Supp. 2d 236, 248 (S.D.N.Y. 2001) (finding no adverse action when the plaintiff was "reprimanded repeatedly for his lateness," but "nothing came of these reprimands"); *Valentine v. Standard & Poor's*, 50 F. Supp. 2d 262, 284 (S.D.N.Y. 1999) ("Given that plaintiff's negative reviews did

not lead to any immediate tangible harm or consequences, they do not constitute adverse actions materially altering the conditions of his employment."), *aff'd*, 205 F.3d 1327 (2d Cir. 2000) (summary order). However, "negative results" typically involve a decrease in pay or being placed on probation, *Hubbard v. Port Auth. of N.Y. & N.J.,* No. 05-cv-4396, 2008 WL 464694, at *12, 2008 U.S. Dist. LEXIS 12316, at *37 (S.D.N.Y. Feb. 20, 2008), or actions that "affect the compensation, promotion opportunities, or any other term, privilege, or condition of [] employment," *Slinkosky v. Buffalo Sewer Auth.*, No. 97-cv-0677, 2000 WL 914118, at *8, 2000 U.S. Dist. LEXIS 9403, at *28 (W.D.N.Y. June 29, 2000). Here, there are no allegations that the investigation and threats of transfer and other unidentified "consequences," lead to immediate tangible harm or consequences and thus do not rise to the level of adverse employment actions.

As to the allegation that Kschinka "threatened [Plaintiff's] job," and told him that he could be "fired right now," "[t]he vast majority of courts in this circuit have held that a threat [of termination] alone does not constitute an adverse employment action," *Mitchell v. SUNY Upstate Med. Univ.*, 243 F. Supp. 3d 255, 281 (N.D.N.Y. 2017) (quoting *Tompkins v. Allied Barton Sec. Servs.*, No. 09-cv-1954, 2010 WL 3582627 at *5 n.6, 2010 U.S. Dist. LEXIS 100427, at *15 n.6 (S.D.N.Y. Aug. 2, 2010)), *aff'd*, 723 F. App'x 62 (2d Cir. 2018), nor was Plaintiff actually terminated—he resigned the same day. *See Slinkosky*, 2000 WL 914118, at *8, 2000 U.S. Dist. LEXIS 9403, at *28; *cf., e.g. Crews v. City of Utica*, No. 17-cv-213, 2021 WL 257120, at *7–8, 2021 U.S. Dist. LEXIS 14038, at *21 (N.D.N.Y. Jan. 26, 2021) (finding adverse employment action where notices of discipline, although still being arbitrated pursuant to a collective bargaining agreement, required the plaintiff to forfeit vacation time and "sought" a penalty of termination, and the plaintiff was subsequently suspended without pay), *appeal docketed* No. 21-217 (2d Cir. 2021).

Therefore, Plaintiff has failed to allege that the January 24, 2020 investigation and threats of disciplinary actions and termination constituted an adverse employment action, all discrimination claims based on this action are dismissed.

### h.    Constructive Discharge

Defendant argues that Plaintiff has failed to allege his "voluntary resignation" was a constructive discharge, because he has failed to allege that Defendant "created working conditions that were 'so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'" (Dkt. No. 39-1, at 10, 12 (citing *E.E.O.C. v. Delta Airlines, Inc.*, No. 97-cv-5646, 2002 WL 1447582, at *5, 2002 U.S. Dist. LEXIS 17259, at *12–13 (E.D.N.Y. June 26, 2002)). Plaintiff responds that his allegations that his complaints "of workplace bullying/harassment and retaliation" went unresolved and that he was falsely accused by Kschinka and King are sufficient to show constructive discharge. (Dkt. No. 35, at 8; Dkt. No. 40, at 3).

"In a discrimination claim, a constructive discharge can serve as an adverse employment action." *Ocasio v. Mohawk Valley Cmty. Coll.*, 20-cv-1355, 2021 WL 4477241, at *10, 2021 U.S. Dist. LEXIS 187890, at *28 (N.D.N.Y. Sept. 30, 2021) (citing *Ryle v. Rehrig Pac. Co.*, 19-cv-1478, 2020 WL 6196144, at *10, 2020 U.S. Dist. LEXIS 195962, at *29 (N.D.N.Y. Oct. 22, 2020)). "Such a claim requires the employee to show both (1) that there is evidence of the employer's intent to create an intolerable environment that forces the employee to resign, and (2) that the evidence shows that a reasonable person would have found the work conditions so intolerable that he would have felt compelled to resign." *Shultz*, 867 F.3d at 308 (quoting *Adams v. Festival Fun Parks, LLC*, 560 F. App'x 47, 49 (2d Cir. 2014)); *see Ocasio*, 2021 WL 4477241, at *10, 2021 U.S. Dist. LEXIS 187890, at *28 ("A constructive discharge occurs where an employer, rather than discharging an employee directly, intentionally creates a work atmosphere

so intolerable that he is forced to quit involuntarily." (citing *Ryle*, 2020 WL 6196144 at *10,

2020 U.S. Dist. LEXIS 195962, at *29)) (internal quotations and alterations omitted).

"[W]orking conditions are intolerable when, viewed as a whole, they are 'so difficult or

unpleasant that a reasonable person in the employee's shoes would have felt compelled to

resign.'" *Terry v. Ashcroft*, 336 F.3d 128, 152 (2d Cir. 2003) (quoting *Chertkova v. Conn. Gen.

Life Ins. Co.*, 92 F.3d 81, 89 (2d Cir. 1996)). "Furthermore, '[a]n employee is also constructively

discharged where she resigns in the face of inevitable termination.'" *Renzi v. Oneida County*, No.

19-cv-1133, 2021 WL 4477233, at *9, 2021 U.S. Dist. LEXIS 187889, at *27 (N.D.N.Y. Sept.

30, 2021) (citing *Bader v. Special Metals Corp.*, 985 F. Supp. 2d 291, 310 (N.D.N.Y. 2013)).

Reading Plaintiff's submissions to raise the strongest arguments they suggest, from

January 2019 to January 2020, Kschinka, King, and Tilison failed to provide a meaningful

response to Plaintiff's complaints regarding: "ongoing harassment and verbal abuse"; harassment

and bullying by an unidentified co-worker or co-workers; and unidentified co-worker or co-

workers who "[u]ndermin[ed] or deliberately imped[ed]" his work. (Dkt. No. 40, at 3–4, 11–12;

Dkt. No. 35, at 3–4; Dkt. No. 35-1, at 4; Dkt. No. 35-2, at 12, 15, 18–21; Dkt. No. 35, at 3–4;

Dkt. No. 35-3, at 15–16). In March 2019, King issued Plaintiff a corrective action notice falsely

charging him with a lack of productivity and contributing to conflict in the work environment.

(Dkt. No. 35, at 1; Dkt. No. 35-2, at 1–2). From June 2019 to January 2020, Tilison

"micromanaged" Plaintiff and added "more work duties." (Dkt. No. 35, at 3). In December 2019,

Plaintiff was moved to "a closet room with no ventilation[] and bar[el]y room to move," after he

complained about seating arrangements. (Dkt. No. 35, at 4; Dkt. No. 35-3, at 18).[16] In the

---

[16] Plaintiff complained about seating arrangements to King in January 2019, (Dkt. No. 40, at 11), Kschinka in March 2019, (Dkt. No. 35-2, at 6), and Tilison in December 2019, (Dkt. No. 40, at 13).

January 24, 2020 meeting that led to Plaintiff's resignation, Kschinka and King accused him of

harassing and bullying Nassim, Kschinka raised her voice, called Plaintiff a liar, told Plaintiff he

could be "fired right now" for applying for a second job or "move[d] to a different location," and

told Plaintiff the investigation would continue and there would be "consequences." (Dkt. No. 35,

at 5; Dkt. No. 40, at 4).

The Court finds that these allegations do not reach the high bar necessary to allow a

plausible inference that Plaintiff's separation from employment with Defendant was a

constructive discharge. Plaintiff has not alleged, for instance, that, while employed, he

experienced a demotion, change in work duties beyond receiving some additional work outside

of his job description, or loss of benefits. *See, e.g., Bader*, 985 F. Supp. 2d at 309–10 ("A

demotion, particularly one that is accompanied by a significant loss of salary, prestige or

responsibilities, or is otherwise 'humiliating,' may also, on its own, give rise to a constructive

discharge claim."). Moreover, courts have found harassing and derogatory statements, failure to

address complaints, false accusations, workplace stress, dissatisfaction with work assignments,

and hypercritical supervision—even in the aggregate—simply do not rise to the level of

constructive discharge. *See, e.g.*, *Cain v. N. Country Cmty. Coll.*, No. 20-cv-232, 2020 WL

7230722, at *3, 2020 U.S. Dist. LEXIS 229993, at *8–9 (N.D.N.Y. Dec. 8, 2020) (finding the

plaintiff failed to plausibly plead constructive discharge when she did not allege "any specific

reason for her decision to leave her job other than the purported false accusations made against

her . . . the 'workplace stress,' and [her employer's] alleged failure to address her complaints");

*Ryle*, 2020 WL 6196144, at *10, 2020 U.S. Dist. LEXIS 195962, at *29–30 (finding that the

plaintiff failed to allege facts plausibly suggesting that he was constructively discharged where,

although he alleged that the defendants' "harassing conduct" and "failure to remedy the conduct"

forced him out, he did not allege any other specific reason for his decision to leave his job, failing to meet that "high standard required to show a constructive discharge"); *Costa v. City of New York*, 546 F. Supp. 2d 117, 119 (S.D.N.Y. 2008) ("[A constructive discharge] claim is not made out 'simply through evidence that an employee was dissatisfied with the nature of his assignments . . . Nor is it sufficient that the employee feels that the quality of his work has been unfairly criticized . . . [and e]vidence of hypercritical supervision [also falls] short of permitting an inference of constructive discharge.") (internal quotations omitted) (quoting *Stetson v. NYNEX Serv. Co.*, 995 F.2d 355, 360 (2d Cir. 1993)); *Dowrich-Weeks v. Cooper Square Realty, Inc.*, 535 F. App'x 9, 12 (2d Cir. 2013) (affirming dismissal of constructive discharge claim, finding the plaintiff's allegations of, inter alia, an executive's negative comments about the plaintiff to a client, move from office to cubicle, and reduction of responsibilities, were insufficient to allege "working conditions so intolerable that" the plaintiff "was forced into an involuntary resignation" (quoting *Kirsch v. Fleet St. Ltd.*, 148 F.3d a49 (2d Cir. 1998))). Finally, although Plaintiff alleges that Kschinka threatened termination, there are no allegations indicating that termination was inevitable. *Renzi*, 2021 WL 4477233, at *9, 2021 U.S. Dist. LEXIS 187889, at *27; *cf., e.g., Bright-Asante v. Saks & Co., Inc.*, 242 F. Supp. 3d 229, 243–44 (S.D.N.Y. 2017) (finding plaintiff plausibly plead constructive discharge when he alleged that he was indefinitely suspended without pay for months with no indication that he would ever be called back); *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1188 (2d Cir. 1987) (finding genuine issue of material fact as to whether plaintiff was constructively discharged when he alleged that his boss told him that "he would be fired at the end of [a] 90-day probation period no matter what he did").

Therefore, as the Court finds that Plaintiff has failed to plausibly plead constructive discharge as an adverse employment action, Plaintiff's constructive discharge discrimination claims are dismissed.[17]

### 2. Inference of Discrimination

Having concluded that Plaintiff adequately alleged adverse action with respect to the Holter Monitor Tech position, the Court must consider whether he plausibly alleges his race was a motivating factor in Defendant's failure to promote. "An inference of discrimination can arise from circumstances including, but not limited to, the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the [adverse employment action]." *Littlejohn*, 795 F.3d at 312 (citation and quotation marks omitted). "[A]n inference of discrimination also arises when an employer replaces a terminated or demoted employee with an individual outside the employee's protected class." *Id.* at 312–13.

### a. Race Discrimination

Plaintiff's allegations that he was told EKG experience was required for the Holter Monitor Tech position and that he should not apply if he did not have the requisite experience, but that Defendant hired Caucasian employees without that experience, are sufficient to plausibly

---

[17] To the extent Plaintiff alleges post-employment discrimination claims, (see Dkt. No. 35, at 5, 7 (alleging that Defendant denied vacation pay following his resignation and accused him of HIPAA violations)), such claims fail to state a plausible claim for relief because "Title VII's antidiscrimination provisions are limited to 'discriminatory actions that affect the terms and conditions of employment' and are thus not applicable to post-employment discrimination." *Mugabo v. Compass Grp.*, No. 20-cv-01354, 2021 WL 7500250, at *4 n.7, 2021 U.S. Dist. LEXIS 255038, at *10 n.7 (W.D.N.Y. Dec. 28, 2021) (citing *Bryant v. Covina-Valley Unified Sch. Dist.*, No. 17-cv-1274, 2018 WL 6016924, at *3, 2018 U.S. Dist. LEXIS 228625, at *8 (C.D. Cal. 2018)), *report and recommendation adopted* No. 20-cv-01354, 2022 WL 787962, 2022 U.S. Dist. LEXIS 46090 (W.D.N.Y. Mar. 15, 2022); *see also Hopkins v. Bridgeport Bd. of Educ.*, 834 F. Supp. 2d 58, 64–65 (D. Conn. 2011) (dismissing the plaintiff's Title VII post-employment discrimination claim).

allege an inference of racial discrimination. *See id.* at 313 (finding allegations that following her demotion, the plaintiff "was replaced by a white . . . employee" who was less qualified were "sufficient to make plausible her claim that her demotion occurred under circumstances giving rise to an inference of discrimination"). Thus, at this stage, the Court finds that Plaintiff has plausibly racial discrimination on the basis of failure to promote for the Holter Monitor Tech position. Accordingly, Defendant's motion to dismiss Plaintiff's racial discrimination failure to promote claim is denied.

### b.    Gender Discrimination[18]

Plaintiff, however, fails to allege gender discrimination with respect to the Holter Monitor Tech position. Plaintiff alleges that Defendant filled the two Holter Monitor Tech positions that were open during his employment with one female and one male employee, who, like Plaintiff, lacked the requisite experience. While the hiring of someone outside the plaintiff's protected group ordinarily suffices to establish an inference of discrimination, Plaintiff's allegations that Defendant hired both a female and a male for the position undermine any such inference in this case. And as Plaintiff has alleged no other circumstances surrounding the hiring for the Holter Monitor Tech position, the Court finds Plaintiff fails to allege facts that would support a plausible inference that Defendant failed to promote him because of his gender. *See Moore v. City of New York*, No. 15-cv-6600, 2017 WL 35450, at *12, 2017 U.S. Dist. LEXIS

---

[18] Plaintiff alleges in the Second Amended Complaint that co-workers made "homophobic remarks" to him, (Dkt. No. 35, at 3), and alleges in his opposition papers that his co-worker Anita Nassim called him gay, (Dkt. No. 40, at 2). "In 2020, the Supreme Court held that 'homosexuality and transgender status are inextricably bound up with sex' and that 'to discriminate on these grounds requires an employer to intentionally treat individual employees differently because of their sex.'" *Cargian v. Breitling USA, Inc.*, No. 15-cv-1084, 2021 WL 4780327, at *7, 2021 U.S. Dist. LEXIS 190053, at *20 (S.D.N.Y. Sept. 13, 2021) (citing *Bostock v. Clayton Cty., Ga.*, 140 S. Ct. 1731, 1741–02 (2020), *aff'g Zarda v. Altitude Express, Inc.*, 883 F.3d 100, 112 (2d Cir. 2018) (overruling precedent to hold that "sexual orientation discrimination is motivated, at least in part, by sex and is thus a subset of sex discrimination . . . which is an impermissible basis for adverse employment actions")). Here, however, Plaintiff does not allege that he is homosexual: in his Charge of Discrimination, he wrote that he had been "discriminated against because of [his] . . . gender/male," with no mention of his sexual orientation. (Dkt. No. 35-1, at 3–4).

379, at *36 (S.D.N.Y. Jan. 3, 2017) ("Beyond merely identifying himself as an African American male and noting that a number of [the] [d]efendants involved in the alleged adverse actions suffered by [the plaintiff] are 'white' and/or 'female,' [the plaintiff] proffers no other facts to support his claim that [the] [d]efendants took action against him because of his membership in a protected class."), *report-recommendation adopted by* 2017 WL 1064714, 2017 U.S. Dist. LEXIS 40629 (S.D.N.Y. Mar. 20, 2017). Accordingly, Defendant's motion to dismiss Plaintiff's failure to promote claims based on gender discrimination is granted.

### C.    Retaliation

Defendant argues that Plaintiff has failed to plausibly state a claim for retaliation, as he has not alleged (1) that he engaged in a protected activity, (2) that Defendant took any adverse employment action against him, and (3) a "causal connection" between any protected activity and his resignation from Capital Cardiology. (Dkt. No. 39-1, at 13–14). The Court agrees.

"[F]or a Title VII retaliation claim to survive a motion to dismiss, the plaintiff must plausibly allege that: (1) defendants discriminated—or took an adverse employment action— against him, (2) 'because' he has opposed any unlawful employment practice." *Vega*, 801 F.3d at 90. Title VII prohibits an employer from retaliating against an individual because he 'opposed any practice' made unlawful by Title VII." *Id.* (quoting *Townsend*, 679 F.3d at 48).

### 1.    Protected Activity

Under Title VII, it is "unlawful for an employer to retaliate against an individual because she 'opposed any practice' made unlawful by Title VII," such as race or gender discrimination. *Id.* (quoting *Townsend*, 679 F.3d at 48); *see also Int'l. Healthcare Exch., Inc. v. Global Healthcare Exch., LLC*, 470 F. Supp. 2d 345, 357 (S.D.N.Y. 2007) ("[A]mbiguous complaints that do not make the employer aware of alleged discriminatory misconduct do not constitute protected activity.").

Plaintiff alleges numerous instances in which he complained to his supervisors about various issues: he complained about his co-worker Nassim, specifically that she was making personal phone calls and not working, (Dkt. No. 35, at 6; Dkt. No. 35-1, at 4; Dkt. No. 35-2, at 12; Dkt. No. 40, ¶ 13), and about co-workers "harassing and bullying" him, and ignoring him, (Dkt. No. 35, at 3–4; Dkt. No. 35-2, at 15–16, 19–22), and about how his work area was noisy and distracting, and a scanning project was overwhelming him, (Dkt. No. 35, at 4; Dkt. No. 35-2, at 13, 18). But none of these complaints mention race or gender and thus do not constitute protected activity. *See Qamar v. Sheridan Healthcare of Conn.*, No. 18-cv-1359, 2020 WL 4548136, at *11, 2020 U.S. Dist. LEXIS 140557, at *35 (D. Conn. Aug. 6, 2020) ("[C]omments which do not complain of discrimination—in other words, complaints about the workplace which do not implicate the protections of Title VII—are not protected."). There are, however, three other complaints that warrant further discussion. The first is the March 25, 2019 email Plaintiff sent to Kschinka following the Corrective Action Notice; the second and third complaints arise in the context of Plaintiff's post-employment retaliation claim and are discussed in that Section. *See infra* Section IV.D.

In his March 25, 2019 email to Kschinka, Plaintiff wrote that he did not know if the Corrective Action Notice had "anything to do with [his] race or not" but "wonder[ed]," and that he was a "young Black Well Educated Man With no Bad history through [his] Work history," (Dkt. No. 35-2, at 6–7). Although Defendant has not addressed whether Plaintiff's email to Kschinka in HR, in which Plaintiff "wonder[ed]" whether the Corrective Action Notice was because of his race, is sufficient to allege protected activity, the Court concludes these allegations allow a plausible inference, at this early stage, of protected activity. *See, e.g.*, *Joseph v. Owens & Minor Distrib., Inc.*, 5 F. Supp. 3d 295, 317 (E.D.N.Y. 2014) (finding, on summary

judgment, that evidence that the plaintiff told his managers, inter alia, "that he didn't know why this was happening to him and perhaps it was related to his race, and questioned whether the attitude he received was because of race," "could be construed as a form of complaint about discrimination" even though human resources notes indicated that the plaintiff "didn't make any specific allegation but was kind of wondering out loud," and "never claimed racism explicitly") internal quotation marks omitted), *aff'd*, 594 F. App'x 29 (2d Cir. 2015); *Edwards v. Thomson Reuters Inc.*, No. 19-cv-93, 2022 WL 767218, at *6, 2022 U.S. Dist. LEXIS 45076, at *17 (S.D.N.Y. Mar. 14, 2022) (finding the plaintiff's allegations that "she made a number of verbal complaints to" human resources "relating to her *suspicions* of race-based discriminatory pay" were "even if informal . . . sufficiently specific to constitute protected activity") (emphasis added).

## 2.   Adverse Actions and Causal Connection

Generally, "an adverse employment action is any action that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" *Vega*, 801 F.3d at 90 (quoting *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)). "This definition covers a broader range of conduct than does the adverse-action standard for claims of discrimination under Title VII: '[T]he antiretaliation provision, unlike the substantive [discrimination] provision, is not limited to discriminatory actions that affect the terms and conditions of employment.'" *Id.* (quoting *Burlington Northern*, 548 U.S. at 64). The Supreme Court has explained that it has:

> phrase[d] the standard in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters. "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed."

*Burlington Northern*, 548 U.S. at 69 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81–82 (1998)). To determine "whether conduct amounts to an adverse employment action, the alleged acts of retaliation need to be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable." *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010).

"To adequately plead causation, 'the plaintiff must plausibly allege that the retaliation was a "but-for" cause of the employer's adverse action.'" *Duplan v. City of New York*, 888 F.3d 612, 625 (2d Cir. 2018) (quoting *Vega*, 801 F.3d at 90). However, "'[b]ut-for' causation does not . . . require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Id.* (quoting *Vega*, 801 F.3d at 91). "A retaliatory purpose can be shown indirectly by timing: protected activity followed closely in time by adverse employment action," *Vega*, 801 F.3d at 90, or "directly, through evidence of retaliatory animus directed against the plaintiff by the defendant.'" *Littlejohn*, 795 F.3d at 319 (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir.2000)).

The adverse actions that allegedly followed Plaintiff's March 25, 2019 email include, the April 5, 2019, failure to promote to Holter Monitor Tech, the May 3, 2019 failure to promote to the nursing support position, supervisory inaction from May 22, 2019 to January 23, 2020 by King, Tilison, and Kschinka in response to Plaintiff's complaints regarding co-workers, seating, "harassment" and "abuse," and Nassim's "behavior," Plaintiff's placement in a "closet room," assignment of increased work load, and culminating in King and Kschinka's January 24, 2020 notification to Plaintiff that he was being investigated, interrogation, and threats of termination.

(Dkt. No. 35, at 2–4, 6–7, 19–21; Dkt. No. 35-1, at 4; Dkt. No. 35-2, at 10, 12, 15–16, 18; Dkt. No. 36, at 2; Dkt. No. 40, at 4, 12).

### a.      Failure to Promote

Plaintiff identifies three positions to which he was denied promotion: two Holter Monitor Tech positions, the first in March 2018 and the second in April 2019, and the nursing support position in May 2019. The Court applies the factors it recited in connection with Plaintiff's discriminatory failure-to-promote claim, *see supra* Section IV.B.1.b., to his retaliation claim. *See also Hatcher v. CVS Corp.*, No. 04-cv-992, 2008 WL 11448031, at *13, 2008 U.S. Dist. LEXIS 140630, at *37–38 (E.D.N.Y. Sept. 16, 2008) (applying discriminatory denial of promotion factors to retaliatory denial of promotion), *report and recommendation adopted*, 2008 WL 11448030, 2008 U.S. Dist. LEXIS 140688 (E.D.N.Y. Sept. 30, 2008), *aff'd*, 358 F. App'x 270 (2d Cir. 2009).

Read liberally, the Second Amended Complaint alleges that Plaintiff first inquired about the first Holter Monitor Tech position in or about March 2018, and that it was filled shortly thereafter. As the March 2018 hiring occurred *prior* to Plaintiff's alleged protected conduct in March 2019, there can be no causal connection. Although a second Holter Monitor Tech position was allegedly filled on April 5, 2019, just weeks after Plaintiff's alleged protected conduct, there are no allegations that Plaintiff inquired into, or displayed any interest in, that position following his March 2018 inquiry. *See, e.g., Gupta v. New York City Sch. Const. Auth.*, 305 F. App'x 687, 690 (2d Cir. 2008) ("Because Gupta cannot claim retaliation based on defendant's failure to rehire him for a position for which he did not apply, this claim was properly dismissed."). Thus,

Plaintiff fails to allege retaliatory failure to promote with respect to the April 2019 Holter Monitor Tech position.[19]

### b.   Complaints Regarding Co-workers

Plaintiff alleges he made complaints from May 2019 through January 2020 to King, Tilison, and Kschinka about co-workers applying for other jobs, laughing and joking on the phone, and giving him "nasty" looks or ignoring him when he tried to say hello, as well as about seating arrangements, and that King, Tilison, and Kschinka failed to respond adequately. (Dkt. No. 35, at 3–4; Dkt. No. 45-1, at 4; Dkt. No. 35-2, at 12, 15–21; Dkt. No. 40, at 4, 12). The failure to respond, as alleged here, does not rise to the level of a materially adverse action for purposes of a retaliation claim. As "petty slights, minor annoyances, and simple lack of good manners will not give rise to actionable retaliation claims," *Millea v. Metro-N. R.R. Co.*, 658 F.3d 154, 165 (2d Cir. 2011) (internal quotation marks omitted),[20] the failure to respond to Plaintiff's complaints about such co-worker conduct is too minor to allow an inference of adverse employment action for purposes of a retaliation claim. Moreover, although Plaintiff alleges that he also complained about "verbal abuse" and "harassment," (Dkt. No. 35, at 5; Dkt. No. 35-2, at 19–21), he provides no factual details about those incidents. *See Sosa v. New York*

---

[19] As discussed, Plaintiff plausibly alleges racially discriminatory failure to promote with respect to the Holter Monitor Tech position, even though Plaintiff does not allege he applied for those positions. Plaintiff's allegations that he was told in March 2018 and in July and October 2019, that certain training or experience was required for the position, and that Defendant hired Caucasians for the position. These allegations allow a plausible inference that Plaintiff's application for the position would have been futile and of racially discriminatory intent. However, there is no basis for extending the futility inference to a retaliatory failure to promote claim, and without an allegation that Defendant was aware of Plaintiff's interest in the April 2019 Holter Monitor Tech position, Plaintiff fails to allege a plausible retaliation claim. *See Petrosino*, 385 F.3d at 227 (explaining that the application "requirement also protects employers from the unfair burden of having 'to keep track of all employees who have generally expressed an interest in promotion'" (quoting *Brown*, 163 F.3d at 710).

[20] Plaintiff's claim that he was being "micromanaged" by Tilison a co-worker made him "look bad," (Dkt. No. 35, at 3), also falls into the category of "petty slights" and "minor annoyances." *Richards v. Dep't of Educ of City of New York*, No. 21-cv-338, 2022 WL 329226, at *17, 2022 U.S. Dist. LEXIS 19674, at *53 (S.D.N.Y. Feb. 2, 2022). Thus, Plaintiff fails to allege is its adverse action in the retaliatory context.

*City Dep't of Educ.*, 368 F. Supp. 3d 489, 518 (E.D.N.Y. 2019) (finding the plaintiff's

allegations of denial of preparation time and subjection to false accused of rules violations and

workplace misconduct, in retaliation for protected conduct, lacked "any specifics" and were "too

minor" to allow "an inference that such denials were retaliatory and 'might have dissuaded a

reasonable worker from' engaging in protected activity"); *see also Davies v. New York City*

*Dep't of Educ.*, 563 F. App'x 818, 820 (2d Cir. 2014) (finding the defendant's "purported failure

to respond to [the plaintiff's] complaints do not rise to the level of a materially adverse action").

### c.   Workspace

    Plaintiff alleges that his workspace was "intolerable," and that in December 2019, after

he complained to his supervisor that his area was "very noisy and distracting," (Dkt. No. 35-2, at

18), he was moved to a "closet room with no ventilation[] and bar[ely] room to move," (Dkt. No.

35, at 4). Even assuming the reassignment to a "closet room" constitutes an adverse action for

purposes of a retaliation claim, *see, e.g.*, *Pellei v. Int'l Planned Parenthood Fed'n/W.*

*Hemisphere Region, Inc.*, No. 96-cv-7014, 1999 WL 787753, at *12–13, 1999 U.S. Dist. LEXIS

15338, at *35 (S.D.N.Y. Sept. 30, 1999) (reassignment to a "small, poorly lit, isolated cubicle"

was an adverse employment action where plaintiff was also terminated and had responsibilities

taken away from her), given that (1) at least eight months passed between Plaintiff's alleged

protected activity, and (2) there are no factual allegations supporting causation, the eight-month

gap is insufficient to support causation. *See Farooq v. City of New York*, No. 20-3185, 2022 WL

793117, at *4, 2022 U.S. App. LEXIS 6739, at *10 (2d Cir. Mar. 16, 2022) (affirming dismissal

where "retaliation claim rests entirely on the temporal proximity between his filing of the EEO

complaint in January 2019 and his suspension some five months later in June 2019" explaining

the "five-month temporal gap here, standing alone, is insufficient to plead causation" (citing

*Hollander v. Am. Cyanamid Co.*, 895 F.2d 80, 85–86 (2d Cir. 1990)); *see also Feliciano v. City*

*of New York*, 14-cv-6751, 2015 WL 4393163, at *10, 2015 U.S. Dist. LEXIS 92623, at *27

(S.D.N.Y., July 15, 2015) ("[W]here no additional facts are pled, temporal proximity ordinarily

requires that the allegedly retaliatory act occur within two months of the plaintiff's protected

activity.").

### d.   Workload

Plaintiff's allegations that Tilison assigned additional duties, including handling MRI

consults, without extra pay or promotions, (Dkt. No. 35, at 3–4), in October and November 2019,

are likewise insufficient to allege adverse action. *See Ziyan Shi*, 393 F. Supp. 3d at 338 (finding

the plaintiff's allegations "regarding the changes to his caseload," including the assignment of an

"an impossible and unachievable caseload and unrealistic deadlines," to be "insufficient to allege

an adverse action" for purposes of retaliation claim) (internal quotation marks omitted).

### e.   Threats of Termination and Transfer

Plaintiff's allegations that on January 24, 2020, Kschinka and King informed him that he

was being investigated, "interrogated" him, accused him of harassing and bullying Nassim,

called him a liar, told him "to delete his Indeed profile," and threatened termination and transfer,

and that Kschinka "raised her voice," (Dkt. No. 35, 4–5; Dkt. No. 40, at 2–4), without any

allegation that would permit an inference that the threat would be carried through, are

insufficient to allege adverse action. *See Tyson v. Town of Ramapo*, No. 17-cv-4990, 2019 WL

1331913, at *14, 2019 U.S. Dist. LEXIS 48875, at*38–39 (S.D.N.Y. Mar. 25, 2019) (finding the

plaintiff's allegations that she received two letters threating to terminate her employment were

insufficient to allege adverse action"); *Blair v. L.I. Child & Fam. Dev. Servs., Inc.*, No. 16-cv-

1591, 2017 WL 722112, at *14, 2017 U.S. Dist. LEXIS 14177, at *42 (E.D.N.Y. Jan. 31, 2017)

("[D]espite the broader definition of adverse employment action for a retaliation claim, neither a

threat of termination or denial of health benefits on its own, without further allegations

establishing her right to those benefits, constitute an adverse employment action sufficient to support a claim."), *report recommendation adopted by* 2017 WL 728231, 2017 U.S. Dist. LEXIS 25573 (E.D.N.Y. Feb. 21, 2017); *see also Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 568–72 (2d Cir. 2011) (holding that investigatory sessions, counseling, threats of termination, hostile behavior during meeting, being made to come to work on day off under false pretenses, and being switched to night shift were not materially adverse actions for retaliation claim). Even if these allegations were sufficient, without additional factual allegations supporting causation, the nine-month gap between the protected activity and adverse action fails to allege causal connection. *Farooq*, 2022 WL 793117, at *4, 2022 U.S. App. LEXIS 6739, at *10.

Finally, because Plaintiff fails to allege that any of the alleged adverse actions affected him in a materially adverse manner, even considered in the aggregate, these actions fail to allow a plausible inference of retaliation. *Kelly v. New York State Off. of Mental Health*, 200 F. Supp. 3d 378, 408 (E.D.N.Y. 2016) (evaluating the adverse actions alleged, including the defendants' failure to adequately investigate the plaintiff's allegations surrounding an assault, assignment of additional work, being told to "take some time off," "additional assorted allegedly mean-spirited comments from co-workers and supervisors," the plaintiff's "purported constructive discharge" and concluding that "[w]hether evaluating the purportedly adverse actions individually or in the aggregate, they did not result in a materially adverse action"). For much the same reason, Plaintiff fails to allege a retaliatory constructive discharge claim. *See Johnson v. Potter*, No. 04-cv-6634, 2009 WL 2180354, at *17, 2009 U.S. Dist. LEXIS 62845, at *48 (W.D.N.Y. July 22, 2009) (concluding that "when dealing with a claim for constructive discharge resulting from retaliation, actual retaliation is a necessary predicate"), *aff'd*, 398 F. App'x 644 (2d Cir. 2010).

Accordingly, Defendant's motion to dismiss retaliation claims arising during Plaintiff's employment is granted.

### D.    Post-Employment Retaliation

Read liberally, Plaintiff's submissions allege three instances of post-employment retaliation: (1) Kschinka's January 24, 2020 email that she had "proof" that Plaintiff had "texted co-workers to complain" and assertion that Plaintiff "did lie" to her, (Dkt. No. 35-2, at 23); (2) the February 23, 2020 email from a human resources coordinator stating that Defendant would not "pay out vacation" time because Plaintiff quit "without proper notice," (Dkt. No. 35-2, at 28); and (3) the February 7, 2020 letter from Kschinka accusing Plaintiff of HIPAA violations, (Dkt. No. 35-2, at 27–28).

"[I]n certain instances," a plaintiff may recover for post-employment retaliation. *See Mira v. Kingston*, 218 F. Supp. 3d 229, 235 (S.D.N.Y. 2016) ("Title VII does—in certain instances—protect against post-employment retaliation." (citing *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997)); *Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir. 1997))). For example, "[a] negative reference or similar actions taken with respect to a new prospective employer can be considered an adverse action and therefore provide support for a retaliation claim." *Shakerdge v. Tradition Fin. Servs., Inc.*, No. 16-cv-01940, 2017 WL 4273292, at *5, 2017 U.S. Dist. LEXIS 157346, at *13–14 (D. Conn. Sept. 26, 2017); *see also Wanamaker*, 108 F.3d at 466 ("[P]laintiffs may be able to state a claim for retaliation, even though they are no longer employed by the defendant company, if, for example, the company 'blacklists' the former employee, wrongfully refuses to write a recommendation to prospective employers, or sullies the plaintiff's reputation."); *Silver v. Mohasco Corp.*, 602 F.2d 1083, 1090 (2d Cir. 1979) (explaining that post-employment blacklisting falls within the scope of retaliatory provisions of Title VII), *rev'd on other grounds*, 477 U.S. 807, 814 n.17 (1980).

As previously indicated, the Court must first consider whether the two complaints Plaintiff identifies in connection with his post-employment retaliation claim, his January 24, 2020 resignation letter and his January 25, 2020 email to Kschinka, (Dkt. No. 35-2, 22, 25–26), may be read to allege protected conduct.[21] The Court concludes while that Plaintiff fails to allege the resignation letter constitutes protected conduct, he adequately alleges that his email does.

In the January 24, 2020 resignation letter, Plaintiff wrote that he "quit due to discrimination and accusing me of something I did not do . . . I am a hard worker and being taken advantage of." (*Id.* at 22). Although Plaintiff remarked in the letter that he quit "due to discrimination," (*id.*), Plaintiff failed to state that he was quitting due to racial or gender discrimination. *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 15 (2d Cir. 2013) (per curiam) (finding that even though plaintiff's complaint "repeatedly used the words 'discrimination ' and 'harassment,'" "there was nothing in her protests that could reasonably have led [the company] to understand that [gender discrimination] was the nature of her objections") (internal citation and quotation marks omitted); *Int'l Healthcare Exch., Inc.*, 470 F. Supp. 2d at 357 (explaining that "ambiguous complaints that do not make the employer aware of alleged discriminatory misconduct do not constitute protected activity"). Thus, because Plaintiff did not specify the conduct he was complaining about, he fails to allege this remark constitutes activity protected under Title VII.

Plaintiff's January 25, 2020, email to Kschinka, however, may be read to complain of race discrimination. The day after he resigned, Plaintiff sent an email to Kschinka stating, in

---

[21] Because the Court concluded that Plaintiff fails to allege retaliation in connection with his March 25, 2019 email questioning whether King issued the Corrective Action Notice because of his race, and because there are no allegations that would allow an inference that the alleged post-employment actions have any connection to the March 25, 2019 email, the Court solely considers whether Plaintiff has sufficiently alleged Defendant retaliated against him for his assertion of discrimination at the time of his resignation.

relevant part, that he believed he had been "taken [a]dvantage of" and "[t]alked [d]own to

because of [his r]ace" during his employment. (Dkt. No. 35-2, at 25–26). As Plaintiff adequately

protected activity with respect to this email, the Court turns to Plaintiff's allegations of post-

employment retaliatory actions.

Plaintiff has not plausibly alleged that Kschinka's January 24, 2020 email to him

following his resignation constitutes an adverse action. (Dkt. No. 35-2, at 23). First, it would not

dissuade a reasonable worker from making or supporting a charge of discrimination. *Vega*, 801

F.3d at 90. Although Plaintiff argues that Kschinka's response to his resignation letter "should

have been only Thank you or acknowledging she received it instead hr. director was very

unprofessional and Aggressive," (Dkt. No. 35, at 5), a single allegedly unprofessional email

simply does not rise to an actionable level of retaliation. *See Blue v. City of Hartford*, No. 18-cv-

00974, 2019 WL 612217, at *7, 2019 U.S. Dist. LEXIS 23277, at *21 (D. Conn. Feb. 13, 2019)

("Petty slights or minor annoyances that often take place at work and that all employees

experience do not constitute actionable retaliation." (quoting *Hicks*, 593 F.3d at 165)). Second,

there is no plausible basis for inferring that this email between Plaintiff and Kschinka would

amount to blacklisting or would sully Plaintiff's reputation. *Wanamaker*, 108 F.3d at 466.

Further, Plaintiff has not alleged that either the HIPAA violation letter or the withholding

of his vacation pay amount to adverse actions for the purposes of a retaliation claim, as Plaintiff

does not allege that any of these actions affected his future employment prospects. *See Stathatos

v. Gala Resources, LLC*, No. 06-cv-13138, 2010 WL 2024967, at *13, 2010 U.S. Dist. LEXIS

50511, at *35 (S.D.N.Y. May 21, 2010) (granting summary judgment for the defendant when a

plaintiff alleged that her employer rescinded a post-employment promise to pay health insurance

in response to filing of discrimination lawsuit). The HIPAA violation letter merely indicates that

Capital Cardiology was "in the process of determining whether this is a HIPAA reportable violation," and that their "investigation" required Plaintiff's response to questions, but Plaintiff does not allege what the result of this investigation was, and thus, his allegations do not allow an inference that the investigation limited his job prospects; accusations of misconduct, without more, do not suffice. *See Johnson v. Summit Acquisitions, LLC*, No. 15-cv-1193, 2019 WL 1427273, at *7, 2019 U.S. Dist. LEXIS 53954, at *21–22 (N.D.N.Y. Mar. 29, 2019) (finding false accusations that a former employee stole from his former employer were not "materially adverse," because there were not allegations that these accusations impacted his employment opportunities, and noting that "courts in the Second Circuit have found false accusations by an employer against a former employee, without more, insufficient to establish an adverse action" (citing *Giarrizzo v. Holder*, No. 07-cv-0801, 2011 WL 4964945, at *6, 2011 U.S. Dist. LEXIS 120739, at *17 (N.D.N.Y. Oct. 19, 2011))). Accordingly, Defendant's motion to dismiss Plaintiff's post-employment retaliation claims is granted.

## V.      LEAVE TO AMEND

Although Plaintiff has not requested leave to amend, in recognition of Plaintiff's status as a pro se litigant and because it may be that Plaintiff could assert cognizable claims with better pleading, Plaintiff is granted leave to seek leave to amend. If Plaintiff seeks to file an Amended Complaint, Plaintiff must first file a letter brief, along with a proposed amended complaint, within twenty-one days of this Order; the letter brief must detail how the proposed pleading cures the deficiencies the Court has identified.

## VI.     CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendant's motion to dismiss (Dkt. No. 39) is **DENIED** as to

Plaintiff's claim of failure to promote to Holter Monitor Tech position based on race; and it is further

**ORDERED** that Defendant's motion to dismiss is otherwise **GRANTED** in its entirety and all claims, except Plaintiff's claim of failure to promote to Holter Monitor Tech position based on race, are **DISMISSED without prejudice**; and it is further

**ORDERED** that if Plaintiff seeks to file an Amended Complaint, Plaintiff must first file a letter brief, along with a proposed amended complaint, within **TWENTY-ONE (21) DAYS** of this Order; the letter brief must detail how the proposed pleading cures the deficiencies the Court has identified. Defendant may file a response within fourteen days, and the Court will hold a conference to discuss the proposed pleading, if necessary.; and it is further

**ORDERED** that if Plaintiff does not file a letter brief proposing amendment, this case will proceed solely with respect to Plaintiff's claim of failure to promote to Holter Monitor Tech position based on race; and it is further

**ORDERED** that the Clerk of the Court is directed to serve this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: <u>June 10, 2022</u>
      Syracuse, New York

Brenda K. Sannes
U.S. District Judge